17 F.3d 317
 Steve WARD, individually and as father and next friend of
Tara Ward and Casey Ward, and Dawn Appenzeller,
individually and as mother and next
friend of Adam Appenzeller,
Plaintiffs-Appellees,
v.
UNITED STATES CUSTOMS SERVICE, Twelve Unknown Agents,
Defendants-Appellants.
 No. 92-2237.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 28, 1994.
 
 Wendy M. Keats, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, D.C. (Stuart M. Gerson, Assistant Attorney General, Stuart E. Schiffer, Acting Assistant Attorney General, Barbara L. Herwig, Attorney, Appellate Staff, Civil Division, Department of Justice, Washington, D.C., and Don J. Svet, United States Attorney, Albuquerque, New Mexico, with her on the briefs), for Defendants-Appellants.
 Phil Blenden, of Blenden Law Firm, Carlsbad, New Mexico, for Plaintiffs-Appellees.
 Before SEYMOUR, Chief Judge, SETH, and LOGAN, Circuit Judges.
 SETH, Circuit Judge.
 
 
 1
 This is an action for damages brought by two adults for themselves, and on behalf of their three minor children, against twelve unknown agents of the United States Customs Service. The Plaintiffs assert violations of their constitutional rights by the forcible entry of a house occupied by Plaintiffs.
 
 
 2
 The case is before us on an interlocutory appeal (28 U.S.C. Sec. 1291) taken by the Defendants, represented by the United States Attorney and the United States Attorney General. The appeal is from the denial of their Motion for Summary Judgment based only on qualified immunity and on "no material facts on which relief could be granted."
 
 
 3
 The issues on appeal center on the force used by the agents to gain entry to the house and the representations in the affidavit used to support both a seizure of property warrant (21 U.S.C. Sec. 881(a)) and a search warrant.
 
 
 4
 The Complaint was served on the Attorney General and the United States Attorney who filed an Answer and an Amended Answer.
 
 The House And Its Occupants
 
 5
 The entry of the house took place about 6:30 a.m. on March 20. On the night before, Steve Ward, the father, left the house in his car about 10:30 to work the night shift at a local mine where he had worked about three years. He would ordinarily return home about 8:00 a.m. from this shift. He was not present at the house when the raid was made. His affidavit in response to the Motion for Summary Judgment states he was aware that the house was under surveillance "by law enforcement officers." The mother of the children in her affidavit states that when Steve Ward prepared to leave the house to work on the night before the raid she saw "unknown persons surveiling [sic] the house." The defense does not challenge these statements about surveillance.
 
 
 6
 It is apparent that the authorities knew who occupied the house. The affidavits supporting the warrants demonstrate that the occupants did not own the house and were renters.
 
 The Entry
 
 7
 Twelve agents comprised the group who made the entry; seizure of the house; and the search. Apparently about eight agents made the initial entry. Agent Frost was in charge. His affidavit to support the Motion for Summary Judgment states in part:
 
 
 8
 "Agents assigned to the warrant entry team were dressed in military type utility uniforms. The agents wore hoods commonly known as balaclavas. Each agent also wore protective goggles. The purpose of the balaclava and goggles is to protect the agent's head and eyes from injury should it become necessary to employ noise-flash diversionary device(s) during the course of entry or while securing the residence. Agents assigned to the entry carried semi-automatic handguns with the exception of 2 agents who carried twelve gauge shotguns.
 
 
 9
 "On March 20, 1991 at approximately 6:17 a.m. agents arrived at 501 South Mesquite Street. Agents took positions at the residence which allowed them to secure all exit points from the residence. I knocked loudly on the residence wall near the front door, announced my identity as a federal agent, the fact that I possessed a search warrant for the premises and demanded immediate entry. I heard immediate movement inside the residence, however, there was no response to my demand for entry to the residence. Based on the fact that I could hear movement inside the residence, but could not see inside, I knew that anyone in the residence had ample time to destroy evidence or to take up a weapon, I instructed the assigned agents to make forced entry into the residence. Forcible entry was made approximately ten seconds after my initial demand for entry to the residence.
 
 
 10
 "Inside the residence agents encountered Dawn Appenzeller in a doorway leading from the hallway into the living room area of the residence. Agents also encountered three small children...."
 
 
 11
 Further the affidavit of Agent Frost for the Summary Judgment Motion recited:
 
 
 12
 "Agents instructed Dawn Appenzeller to be seated on a sofa with the children in the living room area of the residence while the house was being secured.... As soon as the security sweep was completed the involved agents removed their balaclavas and goggles. The residence was then turned over to other agents who carried out the evidentiary search and the seizure of the residence."
 
 
 13
 The affidavit of the mother of the children, Dawn Appenzeller, on the Summary Judgment issue states that she and the children were asleep and states:
 
 
 14
 "... The agents from the United States Customs Service on the morning of March 20 at approximately 6:30 a.m., without notice kicked in the door of our residence and assaulted myself and the three children as we lay in bed with weapons while wearing gas masks which caused extreme fear and emotional trauma to myself and the three children."
 
 And:
 
 15
 "1. On the morning of March 20, 1990, at approximately 6:30 a.m., ... at the time of the entering of the residence by the United States Customs Agents myself along with the three children were asleep in bed. In addition, I did not know these masked and armed men were connected with law enforcement.
 
 
 16
 "2. On the previous night of March 19, I helped prepare Steve Ward's meal to take with him on the graveyard shift and saw unknown persons surveiling [sic] the house as Steve Ward prepared to leave for work."
 
 
 17
 The standards set forth in Pueblo Neighborhood Health Centers v. Losavio, 847 F.2d 642 (10th Cir.), have been met by Plaintiffs. The facts show that the law was clearly established at the pertinent time and was violated by the entry.
 
 
 18
 The Government attorneys seek to rely on the seizure warrant to authorize their action, but this cannot be. There was no emergency; an alternative to entry was indicated, that is, to "leave the warrant on the premises." The warrant authorized entry, but the entry which was made was an obvious constitutional violation under either warrant. To argue that the seizure authorized the entry as made is counterproductive. This is not a Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, case. The probable cause for the seizure entry as made was in no way supported by the warrants. Nor do we have a presumed validity element of the warrant affidavit as considered in Snell v. Tunnell, 920 F.2d 673 (10th Cir.).
 
 
 19
 The basic facts are that Agent Frost knocked on the wall of the house, waited about 10 seconds, thought he heard someone inside, and the door was knocked in and the eight armed officers in fatigues and with protective devices over their faces made the entry followed by four more. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, is controlling, as is Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, where the test was stated as to whether a reasonable officer could have believed the search lawful and force used not excessive. We have considered Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447, but conclude it is not applicable here. The affidavits for the warrants and the affidavits for the Motion for Summary Judgment demonstrate that the raid was carefully planned and certainly had the manpower. It must be concluded that the officers knew in advance who was in the house and there was no believable information that Steve Ward would be there, or that he would cause any problems. He had no record of wrongdoing. There was full knowledge of what could be expected, and it was obvious with the surveillance that no split-second decisions would be needed in the raid on a house with a mother and three children.
 
 
 20
 The single affidavit of Agent Frost for both the warrants is directed almost entirely to the seizure of the real estate. It recites in great detail the purchase of the house by James Mackovich, a person who with his wife were arrested on drug charges. The forgery of a deed by Mr. Mackovich was described, again in detail. The affidavit also stated that Agent Frost interviewed Mrs. Mackovich about a month before the raid and she said Steve Ward rented the house and stated "that Ward utilizes the residence to sell marijuana." The affidavit also says that Mackovich had been under investigation for several months and this included a telephone tap of his telephone.
 
 
 21
 The only reference to Ward in the nine-page warrant affidavit was that quoted above. This is also the only reference to the use of the house. Otherwise, it contains the typical "boiler-plate" statements which are entitled to little weight or none by reason of their overbroad generalities with no particulars whatever. Nothing is mentioned in the warrant affidavit of the telephone taps nor did it mention any surveillance of the house and what may have been seen.
 
 
 22
 As to the force used, Agent Frost in his affidavit to support the Motion for Summary Judgment stated that he had information from an informant and from Sheriff Jack Childress that Steve Ward had a temper and was violent. Sheriff Childress in an affidavit stated that he did not recall discussing Steve Ward with anyone and:
 
 
 23
 "I have no knowledge of any personal traits of Steve Ward and would not know him if I saw him."
 
 He also said:
 
 24
 "I have checked with Deputy Eddy Carrasco who was working the Mackovich case at the time and he has no knowledge of any information concerning Steve Ward or Dawn Appenzeller and none exists in our files."
 
 
 25
 It is apparent from the affidavits and the warrants that what was undertaken was an entry, a seizure, and a search for evidence which would lead to other seizures. We do not find in the record before us any return on the search warrant. There is a return on the seizure warrant.
 
 
 26
 The seizure warrant authorized entry "as necessary in serving this warrant." It also directed service of the warrant to "a party responsible for the property, or, if not practical, then a copy will be left at the location of seizure."
 
 
 27
 It appears that the twelve agents with the forced entry with masks and weapons wanted to demonstrate it was not practicable to leave a copy at the house presumably tacked on the front door.
 
 
 28
 In short, the mixture of the seizure with a search of a house, the ownership of which was known to the authorities, together with knowledge of who rented the house from the owner, was in fact a search for leads to other property acquired by Mackovich which could be seized. The search warrant states, after reciting records, book, etc., "and related material which is evidence of dealing controlled substances and may lead to property which is subject to civil forfeiture in violation of 21 U.S.C. Sec. 881(a)...."
 
 
 29
 No search warrant was requested--only the seizure warrant. A search warrant, however, was issued, but apparently no return was filed, and we see nothing in the materials before us to show it was served.
 
 The Motion for Summary Judgment
 
 30
 The above descriptions demonstrate, as to the material fact element in the Motion for Summary Judgment, that there are a significant number of material facts in issue to support the denial of summary judgment.
 
 
 31
 We must also conclude that the Defendants failed to establish qualified immunity, the only other element in the Motion.
 
 
 32
 We agree with the trial court, the future of seizures of real property under 21 U.S.C. Sec. 881, especially the procedures required, has been determined by the United States Supreme Court in United States v. James Daniel Good Real Property, --- U.S. ----, 113 S.Ct. 1576, 123 L.Ed.2d 145. This was on certiorari from the Ninth Circuit, 971 F.2d 1376.
 
 Personal Jurisdiction
 
 33
 The Government attorneys for the Defendants in this interlocutory appeal request this court to direct the district court to dismiss this case for lack of personal jurisdiction over the agents. As mentioned, this appeal is from the denial by the trial court of Defendants' Motion for Summary Judgment. The trial court did not state the reason for its denial. Again, Defendants appealed pursuant to 28 U.S.C. Sec. 1291 on only the two grounds which were stated in the Motion--the absence of material facts in issue, and the qualified immunity of the agents. The Motion stated that it was made "without submitting to personal jurisdiction."The Defendants in their timely Amended Answer raised the "lack of personal jurisdiction" over the agents as an affirmative defense (No. 3). Most, if not all, subsequent filings by Defendants included a proviso "without submitting to personal jurisdiction." The Motion for Summary Judgment so stated, as above quoted, but made no other reference to jurisdiction.
 
 
 34
 During the period from December 12, 1991 to the filing of the Motion for Summary Judgment there were the Answer and Amended Answer, interrogatories, and responses. However, the "record" before us on this interlocutory appeal by the Defendants contains no more than the pleadings, the affidavit for the warrants, the warrants, the Motion, and affidavits directed to the two issues in the Motion. We must rely on the record before us and on the nature and scope of the appeal. It is apparent that jurisdictional issues can often be decided during the course of the litigation but that cannot be done here.
 
 
 35
 The parties seek to raise issues (and other issues appear) such as the failure of Defendants to respond to interrogatories as to the location or addresses of the agents; whether there was "just cause" for a delay in personal service under Rule 4; whether personal service was required or waived; actual notice; what was the significance, if any, of the requested remedy of a decision on the merits by the Motion.
 
 
 36
 The Motion, and the denial of the Motion, raised no service issue for this appeal. The briefs demonstrate that the "affirmative defense" is a mix of factual issues, rules, and decisions which need to be established but apparently were not presented to the trial court. It is apparent that the statements in the briefs of the parties on this appeal are, with the limited record, not sufficient for our purposes on this issue. Simply put, the issue is not before us.
 
 
 37
 We have considered our case of Brownlow v. Aman, 740 F.2d 1476 (10th Cir.), wherein the litigation was directed to a long-arm service issue. Also: Jones v. Frank, 973 F.2d 872 (10th Cir.); Despain v. Salt Lake Area Metro Gang Unit, 13 F.3d 1436 (10th Cir.).
 
 
 38
 The denial by the trial court of Defendants' Motion for Summary Judgment is AFFIRMED. IT IS SO ORDERED.